UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROSS WHEELER and OSCAR SKJERVEN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>WYZE LABS, INC.,<br><br>                    Defendant. | NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ross Wheeler and Oscar Skjerven ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Wyze Labs, Inc. ("Wyze" or "Defendant"). Plaintiffs allege the following upon information and belief and on investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    In recent years, federal courts across the country have warned that opaque digital tracking practices threaten Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers intrudes on basic expectations of privacy in online activity and reveals how individuals navigate and interact

CLASS ACTION COMPLAINT- 1

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

with websites. When a company represents that visitors can control whether their data is sold, shared, or tracked, but continues to transmit that data after those representations, the conduct raises serious privacy concerns and undermines those representations.

2.    Wyze Labs, Inc. operates the commercial website https://www.wyze.com/ (the "Website"). Visitors use the Website to learn about Wyze's smart home and connected device products, including security cameras, sensors, lighting, and related accessories; create and manage accounts; purchase devices, subscriptions, and service plans; access product support and software updates; and review promotional offers and marketing materials. The Website presents a cookie banner and a cookie preferences interface (the "Cookie Preferences Interface"). These features state that visitors can control what information the Website collects or discloses to third parties (the "Tracking Entities") through software-based monitoring systems embedded on the Website (the "Tracking Tools"). The banner further states that visitors may control the sale or disclosure of their personal information and may disable non-essential cookies through the available settings.

We use cookies and similar tracking technologies, including those provided by third parties, to view and retain your interactions on the site, help us improve our site, services, and marketing campaigns, and to serve you ads. For more information, view our Privacy Policy. By accessing or using our website, you agree to the collection, use, and disclosure of your data as described in our Privacy Policy. You can opt out of disclosures of your data for targeted advertising and similar purposes by visiting our Privacy Policy.

Manage preferences          Decline          Accept

*Figure 1 – Wyze cookie settings page showing controls that allow visitors to change tracking behavior through the Cookie Preferences Interface*

3.    Defendant's assurances are inaccurate. A website acts deceptively when it begins placing and transmitting Tracking Tools before visitors can interact with the cookie banner and continues transmitting visitor data to Tracking Entities after visitors toggle off the sale or sharing of personal information and reject all non-essential cookies. In that situation, the

CLASS ACTION COMPLAINT- 2

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

website collects and transmits visitor information despite the settings visitors select. These practices support claims for intrusion upon seclusion and fraud.

4.      The Website places and transmits Tracking Tools, including cookies, when a visitor lands on a page, before the visitor can view or interact with the cookie banner. The Website deploys these Tracking Tools and sends visitor data to third parties identified in this Complaint as the Tracking Entities. Upon information and belief, the Tracking Entities include TikTok, Google, Meta (also referred to as Facebook), Twitter, Snapchat, Bazaarvoice, and other advertising technology partners whose cookies and pixels track visitors' browsing activity, Website interactions, inputs, device information, session data, and unique identifiers when visitors load webpages or trigger monitored events on the Website. Even after visitors toggle off the sale or sharing of personal information and reject non-essential cookies, the Website continues to deploy the Tracking Tools and allows the Tracking Entities to access, duplicate, and transmit communications between visitors and the Website.

5.      The Tracking Tools collect interaction and behavioral data from visitors. This data includes selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. The data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The Tracking Tools also collect persistent identifiers that allow recognition of users across sessions and websites, email addresses, and approximate geolocation derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information."

6.      The Website's cookie banner and preferences interface mislead visitors about the use and sale of visitor data. The Website states that visitors can control tracking through those settings. At the same time, the Website enables third-party Tracking Entities to monitor visitors' online behavior in real time.

CLASS ACTION COMPLAINT- 3

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

7.      Plaintiffs visited the Website, including in November 2025, to browse the Website. Plaintiffs declined all non-essential cookies. Plaintiffs relied on Defendant's representations and believed the Website would modify its behavior to reflect those choices. The Website instead continued to provide Tracking Entities access to Plaintiffs' browsing activity, page interactions, navigation patterns, and identifiers for advertising and analytics purposes.

8.      Defendant enabled Tracking Entities to access Plaintiffs' Sensitive Information and private communications through the Tracking Tools described above. This conduct intruded on Plaintiffs' privacy and conflicted with Defendant's representations about the Website's data collection practices. Through this conduct, Defendant violated the Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 and § 638.51; the California Consumer Legal Remedies Act, California Civil Code §§ 1770 et seq.; and the California Unfair Competition Law, California Business and Professions Code §§ 17200 et seq., along with common law claims for intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action individually and on behalf of a class of similarly situated visitors whose communications and data were transmitted through these practices.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

10.      This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintain its principal place of business in this District.

CLASS ACTION COMPLAINT- 4

11.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

12.     Plaintiff Ross Wheeler is, and at all relevant times has been, a citizen and resident of the State of Oregon. In or about November 2025, while physically located in Oregon, Plaintiff Wheeler visited the Website. Plaintiff Wheeler did not make any purchases or enter into any service agreement with Defendant. During that visit, Plaintiff Wheeler expressly declined the Website's cookie banner, consistent with his practice of refusing online tracking technologies. Despite declining cookies and without Plaintiff Wheeler's knowledge or informed consent, Defendant's Tracking Tools continued to capture, duplicate, and transmit Plaintiff Wheeler's communications with the Website. As a result of Defendant's procurement of Tracking Entities and use of Tracking Tools, Defendant and Tracking Entities intercepted, transmitted, collected, and used Plaintiff Wheeler's Sensitive Information, despite Defendant's disclosures regarding its data-collection practices contradicting such actions.

13.     Plaintiff Oscar Skjerven is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Skjerven has maintained Defendant Wyze's mobile application and has utilized Defendant's camera-related services for several years. In or about November 2025, while physically located in California, Plaintiff Skjerven visited Defendant's Website and accessed Defendant's services through the Website, specifically viewing their sales and documentation on cameras he already owns. During that visit, Plaintiff Skjerven expressly declined the Website's cookie banner, consistent with his practice of refusing online tracking technologies. Despite declining cookies and without Plaintiff Skjerven's knowledge or informed consent, Defendant's Tracking Tools continued capturing, duplicating, and transmitting Plaintiff Skjerven's communications with the Website. As a result of Defendant's procurement of Tracking Entities and use of Tracking Tools, Defendant and Tracking Entities

CLASS ACTION COMPLAINT- 5

intercepted, transmitted, collected, and used Plaintiff Skjerven's Sensitive Information, despite Defendant's disclosures regarding its data-collection practices contradicting such actions.

14.    Defendant Wyze Labs, Inc. develops, markets, sells, and supports smart home and connected technology products, including security cameras, sensors, lighting, and related software and subscription-based services throughout the United States. Defendant sells its products primarily through direct-to-consumer sales and digital platforms under the Wyze brand, including the Website. Wyze Labs, Inc. provides product development, software and application services, data analytics, marketing, customer support, and operational oversight for its hardware and subscription offerings. Wyze Labs, Inc. operates and supports the marketing, distribution, and commercial operations of its products and services to consumers nationwide through digital platforms such as the Website. Wyze Labs, Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in Kirkland, Washington.

## FACTUAL ALLEGATIONS

### I.    How Websites Function

15.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a visitor's internet browser, as the browser loads and processes the website's code to display the webpage.

16.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

17.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

18.    When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that visitor's browser contacts the DNS (Domain

---

[1] *Browsing the Web: What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 27, 2026).

[2] *Id.*

CLASS ACTION COMPLAINT- 6

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

19.     An IP address is "a unique address that identifies a device on the internet or a local network."[4] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

20.     When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the visitor's browser.[5]

21.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

22.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:

---

[3] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 27, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 27, 2026).

[5] *Id.*

[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

CLASS ACTION COMPLAINT- 7

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 2 - Mozilla's diagram of a URL, including parameters*[7]

23.     Website owners or web developers write and manage the URLs for their websites.

24.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

25.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

26.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:



---

[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 27, 2026).

[8] *Id.*

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 27, 2026).

[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 27, 2026).

[11] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 8

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 3 – Demonstrating URL encoding and decoding[12]*



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 3)*

[12] Viraj Shetty, *URL Encoding in a few minutes*, YouTube (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Mar. 06, 2026).

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

CLASS ACTION COMPLAINT- 9

*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

27. After the visitor sends the Request URL, the server sends the HTTP Response to the visitor, and the visitor's browser assembles the HTTP Response packets into the source code of the webpage. The webpage code is then processed by the visitor's browser as it arrives[13] and "rendered" into a visual display according to the instructions of the HTML, CSS, and JavaScript code.[14] This is the visible, and usually interactable, website that most people think of.

---

[13] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 27, 2026).

[14] *How the web works?*, MOZILLA, (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 10

28.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages, such as JavaScript snippets, which are embedded or called within the HTML code.[15]

29.    Such complex tasks include scheduling appointments or monitoring and reporting visitor activity.

30.    In short, the Internet relies on a constant back-and-forth stream of requests being sent between the visitor and servers.

31.    Unbeknownst to visitors, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up visitors' communications with the Website.

**II.    Defendant Programmed the Website to Include the Tracking Tools**

32.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into the Website's programming. Defendant's use of Tracking Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

33.    The Website uses Tracking Tools that cause visitors' devices to store or transmit first-party and third-party tracking cookies. Cookies are small text files that servers operated by the Website or the Tracking Entities send to a visitor's web browser and store on the visitor's device. Targeting, analytics, and advertising cookies typically contain unique identifiers that allow a website to recognize and distinguish individual visitors. The Tracking Tools collect these cookie files and transmit them to web servers via HTTP requests when visitors trigger the Tracking Tools, allowing the Website and the Tracking Entities to identify the device and visitor communicating with the Website and to record how the visitor interacts with the Website.

---

[15] *See JavaScript: Adding interactivity,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 11

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL 206.682.5600 • FAX 206.682.2992

34. Websites place first-party cookies directly on a visitor's device. These cookies allow the Website to recognize visitors when they return and to record activity that occurs during visits to the Website.

35. Third parties place third-party cookies through servers that operate outside the Website, including domains such as google.com, facebook.com, and other advertising or analytics services. When a visitor's browser loads a webpage that contains embedded Tracking Tools, scripts operated by the Tracking Entities check the visitor's device for existing cookies and create and store cookies when none exist. These cookies contain unique identifiers that allow Tracking Entities to recognize and track visitors across different websites, including the Website, and across multiple browsing sessions.

36. As described below, cookies placed on visitors' devices during interactions with the Website intercept and record communications between visitors and the Website for the Tracking Entities. The recorded information includes visitors' browsing and visit activity, such as webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, and the frequency and recency of visits to the Website. The data also includes session level details such as timestamps, duration, actions taken during visits, and referring URLs that identify the website or platform directing the visitor to the Website.

37. Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring visitor engagement and Website performance; (ii) personalization, including remembering visitor preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on visitor profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and the Tracking Entities to enhance revenue and marketing effectiveness by collecting, analyzing, and disseminating visitor data.

38. Defendant owns and operates the Website. The Website allows visitors to view and learn about Wyze's smart home and connected technology products, create and manage accounts, purchase devices and subscription plans, access product information and customer

CLASS ACTION COMPLAINT- 12

support, and review promotions and marketing offerings. When visitors navigate pages, click links, enter data, or submit information through the Website, they transmit Sensitive Information directly to Defendant.

39.    Defendant integrated the Tracking Tools into the Website's software. When visitors access the Website, those tools place or transmit first-party and third-party cookies on visitors' devices and to Tracking Entities' servers. Defendant controls the Website's software code and determines which Tracking Tools load and operate on the Website. Through that control, Defendant determines whether cookies are placed on visitors' devices and whether visitor data is transmitted to Tracking Entities.

40.    The Website's Cookie Preferences Interface describes Defendant's use of third-party cookies. The interface states that cookies allow the Website to view and retain interactions with the Website, improve the Website, and support marketing and advertising activities.

41.    The Cookie Preferences Interface further states that some cookies are required for basic Website functionality. It also states that other cookies serve additional purposes. The interface explains that disabling cookies may affect the visitor's experience on the Website.

> We use cookies and similar tracking technologies, including those provided by third parties, to view and retain your interactions on the site, help us improve our site, services, and marketing campaigns, and to serve you ads. For more information, view our Privacy Policy. By accessing or using our website, you agree to the collection, use, and disclosure of your data as described in our Privacy Policy. You can opt out of disclosures of your data for targeted advertising and similar purposes by visiting our Privacy Policy.[16]

42.    Defendant describes its use of third-party cookies in its Privacy Policy. In a section titled "Targeted Advertising and Analytics," the Privacy Policy states that certain third parties that provide advertising services may collect or receive information about visitors'

---

[16] Wyze's cookie consent preference (under storage preferences) window as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

interactions with the Website through cookies and similar technologies. The Privacy Policy states that these third parties use that information to deliver targeted advertising.

> We engage others to provide analytics, serve advertisements, and perform related services across the web and in mobile apps. These entities may use cookies, web beacons, SDKs, device identifiers, and other technologies to collect information about your use of our Services and other websites and mobile apps, including your IP address, web browser, mobile network information, pages viewed, time spent on pages or in mobile apps, links clicked, and conversion information. This information is used to deliver advertising targeted to your interests on our Services and other companies' sites or mobile apps and to analyze and track data, determine the popularity of certain content, and better understand your activity. If you are browsing our websites without logging in, we may engage vendors that use tracking technologies to help us better tailor advertising and marketing based on your prior visits. Some of our advertising partners enable us to translate your email address or phone number into an identifier that can't be used to identify you personally. Our advertising partners then use that unique identifier to show ads that are more relevant to you across the web and in mobile apps. Some of the activities described in this section may constitute "targeted advertising," "sharing," or "selling" under certain laws.[17]

43.     The Privacy Policy includes a section titled "Information Collected by Cookies and Similar Tracking Technologies." In that section, Defendant states that it and Tracking Entities use cookies and similar technologies to enhance the Website and support marketing activities. The Privacy Policy also states that third parties may associate the information collected through these technologies with other information they possess about users, which allows those third parties to create detailed user profiles.

> We use tracking technologies, such as cookies, pixels, and SDKs to collect information about your interactions with the Services. For example, we may use such technologies to recognize and alert you if you leave items in your shopping cart. These technologies help us improve our Services and your experience, see which areas and features of our Services are popular, and count visits. Additionally, when you interact with our Services, we and our online data partners or vendors may use cookies, pixels, ad beacons, and similar technologies to associate these activities with information they or others have about you (including your email address). We (or service providers on our

---

[17] *Privacy Policy*, WYZE, (Nov. 19, 2025) https://www.wyze.com/policies/privacy-policy#a (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 14

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

behalf) may send marketing and other communications to these email addresses. You may opt out of receiving this advertising by visiting https://app.retention.com/optout. For more information about the cookies and other tracking technologies we use, and the choices available to you, see the Your Privacy Rights and Choices section below.[18]

**III.    Defendant Falsely Informed Visitors That They Could Opt Out of the Website's Use of Cookies**

44.    The Website displays a pop-up cookie consent banner when users visit the Website. The banner states that the Website uses cookies from Wyze and third parties for performance, advertising, and marketing purposes. The banner provides options that allow users to accept cookies, decline cookies, or manage their Cookie Preferences.



*Figure 7 – Cookie Banner of Wyze representing a "manage preferences" interface to accept or manage Cookie Preferences"*

45.    When users select the "Manage Preferences" option, the Website displays a Cookie Preferences Interface pop up. The interface states that users can disable personalization, advertising, and analytics cookies on the Website.

---

[18] *Id.*

CLASS ACTION COMPLAINT- 15

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

46.     Defendant represented that users could disable all cookies that were not necessary for the Website to function. Defendant also represented that users could choose not to share details about their visits with third parties.



*Figure 8 – Cookie Preferences Interface representing visitors with an option of disabling the selling of visitor information and targeted advertising*

47.     After users declined all non-essential cookies other than those strictly necessary and clicked "Save my choices," or selected "Decline," users could continue browsing the Website. The cookie banner and the Cookie Preferences Interface window then disappeared.

48.     Defendant's Cookie Preferences Interface led Plaintiffs and other Website users to believe they had disabled the sale or sharing of their information and all non-essential cookies. The banner and the preferences window also led users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information on the Website after users disabled the Tracking Tools.

CLASS ACTION COMPLAINT- 16

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**A.** **Tracking Tools on the Website operated before users interacted with the Cookie Banner and after users expressly rejected Tracking Tools.**

49.    Although Defendant recognized that users may desire to limit the information that is communicated to third parties from their use of the Website, Defendant configured its Website such that visitors who accessed the Website and had not yet interacted with the Cookie Banner received Tracking Tools deployed by Bazaarvoice, Google, Facebook, Twitter, Microsoft, and Snapchat by default. For visitors who declined the sale or sharing of their information and rejected all non-essential cookies, the Bazaarvoice and Microsoft Tracking Tools continued to operate.

50.    The pre-rejection and post-rejection Tracking Tools were uniform across all states despite the fact that Defendant's Privacy Policy states that different privacy rights may apply to residents of California, Colorado, Connecticut, Delaware, Iowa, Maryland, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, Oregon, Tennessee, Texas, Utah, or Virginia.[19]

**B.** **Visitors' Experiences Prior to February 17, 2026**

51.    For visitors, including Plaintiffs, who used the Website before February 17, 2026, Defendant's representations about the ability to control the sale or sharing of information through the cookie banner and Cookie Settings Interface were false. Defendant did not follow users' expressed elections regarding cookies. When users rejected all non-essential cookies, they communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Defendant nevertheless caused Tracking Tools from Microsoft and Bazaarvoice to be placed on users' browsers and devices or transmitted to Tracking Entities together with users' Sensitive Information.

52.    Users can observe aspects of the operation of cookies and Tracking Tools on the Website through website developer tools that record network traffic transmitted to and from a user's device during interactions with the Website.

---

[19] *Privacy Policy*, WYZE, (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 17

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

53.     Network traffic logs produced through these tools show HTTP requests and transmissions between users' browsers and multiple Tracking Entities while users visit and interact with the Website.



*Figure 9 – Screenshot depicting Developer Tool on the visitor's browser showing network activity for Google third-party cookies*

CLASS ACTION COMPLAINT- 18

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 10 - Screenshot depicting Developer Tool on the visitor's browser showing the payload activity Google third-party cookies*



*Figure 11 - Screenshot depicting Developer Tool on the visitor's browser showing Google third-party cookies*

CLASS ACTION COMPLAINT- 19



*Figure 12 - Screenshot depicting Developer Tool on the visitor's browser showing network activity for Twitter third-party cookies*

54.     Network logs show that even after users rejected non-essential cookies and opted out of the sale or sharing of their personal information, users' browsers continued to send HTTP requests to Tracking Entities such as Bazaarvoice. These requests continued to rely on non-essential cookies that tracked visitors' activity on the Website.

55.     Through these transmissions, users' Sensitive Information was disclosed to Tracking Entities. These Tracking Tools allow Tracking Entities to track users across websites and, over time, correlate user behavior with other datasets to compile profiles reflecting users' preferences, behaviors, demographics, and inferred characteristics. These profiles are used for advertising, analytics, and marketing purposes.

56.     The Tracking Tools that Defendant caused users' browsers to load and execute functions as unlawful wiretaps because they allow Tracking Entities, who are not parties to the communications, to intercept and record users' Sensitive Information. These entities do not operate as passive tools of the Defendant. They collect and use the intercepted communications for their own commercial purposes as well as for the benefit of the Defendant.

**C.     Defendant changes the Website configuration in  February  2026**

57.     Sometime between February 6, 2026 and February 17, 2026, Defendant changed the configuration of its Website that resulted in the removal of previously operational Tracking Tools.

CLASS ACTION COMPLAINT- 20

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

58.     But sometime between February 18, 2026 and February 24, 2026, Microsoft and Bazaarvoice resumed operation after visitors rejected cookies when the Website was accessed from some states, including New York. Visitors who accessed the Website from California did not experience continued operation of Tracking Tools after rejecting cookies. This distinction corresponded with the state-specific privacy protections referenced in Defendant's Privacy Policy.

**IV.    Defendant's Website Uses Tracking Tools to Spy on Visitors.**

59.     Defendant operates the Website and installed software created by Tracking Entities on the Website. These Tracking Tools operate invisibly and track visitors' activity on the Website.

60.     The Tracking Tools collect information about visitors' activity when events specified by Defendant occur, such as viewing a specific webpage. Defendant determines how much data the Tracking Entities collect and how detailed that data is. This information appears in the parameters included in detailed URLs and in metadata contained in the payload of HTTP requests.

61.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.[20] URL parameters include key-value pairs formatted as "key=value":

a.     The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event).

b.     The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a visitor taking the action of adding a product to their online shopping cart).

[20] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 21

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 13 - Diagram of a URL displaying how parameters function*[21]

**A.    The TikTok Pixel**

62.      TikTok offers software – known as a "tracking pixel" – to track visitors' actions, behavior, and conversions across the Website (the "TikTok Pixel").

63.      The TikTok Pixel is a snippet of code that begins to collect information the moment a visitor lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[22]

64.      Defendant's TikTok Pixel ID is included in transmissions sent to and from visitors' devices, as seen in *Figures 15* and *16*—the TikTok JavaScript code in *Figure 15* references Defendant's Pixel ID, whereas the "code" variable in *Figure 18* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C95LRLRC77U5U5HVQCIG".

---

[21] *Id.*

[22] *See generally Troubleshoot with Pixel Helper*, TikTok, (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Feb. 27, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

CLASS ACTION COMPLAINT- 22

65. TikTok Pixel visitors make use of events to collect even more specific data on visitors' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a visitor's browser), the value of the purchase, and the product purchased.[23]

66. These events, when triggered, cause the relevant data to be sent to TikTok via the TikTok Pixel as communications are received by visitors (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

67. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a visitor);

c. Device information, including make, model, operating system, and browser information);

d. Cookies that can be used to identify visitors; and

e. Metadata and button clicks.[24]

68. The TikTok Pixel collects information that allows Defendant and TikTok to better understand who Defendant's customers are and how visitors navigate the Website.

69. TikTok's "Advanced Matching" feature allows TikTok to "match customer information such as email and phone number along with actions people take on [the Website]."[25] Once Advanced Matching is active, the TikTok Pixel "will automatically find

---

[23] *How to Set Up Events and Parameters with Events Builder*, TIKTOK (last updated Aug. 2025) https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Feb. 27, 2026) (describing how to designate events).

[24] *About TikTok Pixel*, TIKTOK (last updated Mar. 2025) https://ads.tiktok.com/help/article/tiktok-pixel (last visited Feb. 27, 2026).

[25] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025) https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 23

customer information and match it with people on TikTok."[26] TikTok then provides Defendant with detailed marketing profiles of its visitors, including custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[27] Lookalike audiences provided by TikTok allow Defendant to retarget visitors who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[28]

70.     The TikTok Pixel collects data about visitors to the Website and matches that data with information TikTok has previously collected about users. This matching process allows TikTok to associate Website activity with existing user data. Defendant and TikTok use the combined information to analyze visitor behavior, improve advertising performance, and reduce advertising costs.[29]

71.     Defendant deployed the TikTok Pixel on the Website to allow TikTok to monitor and record visitor activity in real time, including when visitors clicked links, loaded webpages, and viewed specific content.

72.     The TikTok Pixel also captures visitors' identifying cookies (for example, the _ttp cookie is used to identify TikTok visitors[30]).

73.     Plaintiffs had a reasonable expectation that: (i) Plaintiffs' identifying information, (ii) information that designated Plaintiffs as interested in Defendant's services,

---

[26] *How to set up Automatic Advanced Matching*, TIKTOK, (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Feb. 27, 2026).

[27] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Feb.27, 2026) (benefits of using the TikTok Pixel).

[28] Lizzie Davey, *See How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Feb .27, 2026).

[29] *Id.*

[30] *See G-Star Raw List of Cookies,* https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Feb. 27, 2026).

CLASS ACTION COMPLAINT- 24

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Case 2:26-cv-01319 Document 1 Filed 04/16/26 Page 25 of 72

and (iii) Plaintiffs' IP address and who Plaintiffs were communicating with to obtain the products would not be exposed to the Tracking Tools placed by Defendant.

74. Defendant uses the TikTok Pixel to track conversions, optimize the delivery of advertising campaigns, create and target custom audiences, and access data used to manage advertising campaigns.[31]

75. TikTok uses data collected through the TikTok Pixel to improve its products and services and to generate benchmarking reports that it provides to other TikTok business customers.[32]

76. According to a leading data security firm, the TikTok Pixel installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off visitor names and passwords, credit card and banking information, and details about visitors' personal health."[33] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before visitors have a chance to accept cookies or otherwise grant consent."[34]

77. The image below shows the TikTok code embedded on Defendant's Website. The code transmits communications from the Website to TikTok, which TikTok uses to collect information about visitor behavior:

---

[31] *See Get started with the TikTok Pixel: a small business guide,* TIKTOK, (Sept. 6, 2024) (last visited Feb. 27, 2026).

[32] *TikTok Business Products (Data) Terms*, TIKTOK (Jan. 22, 2026), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Feb. 27, 2026).

[33] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Feb. 27, 2026).

[34] *Id.*

CLASS ACTION COMPLAINT- 25

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 14 – Home page of the Website*



*Figure 15 – Using a browser's "developer tools" on Wyze's webpage shows the Website loading TikTok Pixel's code onto the visitor's browser*

CLASS ACTION COMPLAINT- 26

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 16 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

78.     The Website transmits communications to TikTok when a visitor views a page and interacts with the Website. The screenshots below show a sample webpage, the webpage code containing TikTok scripts running on the Website, and the electronic transmissions sent to TikTok that contribute to TikTok's records of visitor behavior:

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

CLASS ACTION COMPLAINT- 27



*Figure 17 – Sample product on the Website*

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

```
✕   Headers  Payload  Preview  Response  Initiator  Timing
▼ Request Payload    View source
  ▼ {event: "Pageview", event_id: "sh-29e36414-A27E-4604-ADF2-92482D7E40BB",…}
    ▼ context: {ad: {sdk_env: "external", jsb_status: 2}, device: {platform: "pc"},…}
      ▼ ad: {sdk_env: "external", jsb_status: 2}
          jsb_status: 2
          sdk_env: "external"
          csct: 1
          csid: "1770228870084::BzbpX2HVBVJVhO5RJ2oN"
      ▼ device: {platform: "pc"}
          platform: "pc"
      ▼ library: {name: "pixel.js", version: "2.2.0"}
          name: "pixel.js"
          version: "2.2.0"
      ▼ page: {url: "https://www.wyze.com/products/wyze-cam-pan-v4", referrer: "https://auth.wyze.com/",…}
          load_progress: "-1"
          referrer: "https://auth.wyze.com/"
          url: "https://www.wyze.com/products/wyze-cam-pan-v4"
        page_csid: "1770228870086::gHSnpmsKloNEOCVP4-US"
        pageview_id: "585cbac2-01f5-11f1-868b-ba3651475805-pYXP2.7.0::580caad9-01f6-11f1-9ce1-946dae4c73ca-CIN0Q93C77U4DE8R8S6G"
      ▼ pixel: {code: "CIN0Q93C77U4DE8R8S6G", runtime: "4"}
          code: "CIN0Q93C77U4DE8R8S6G"
          runtime: "4"
        report_endpoint: "/api/v2/shopify_pixel"
        session_id: "585cbac2-01f5-11f1-868b-ba3651475805::Pr5PTfu63hXnT08uenpZ-CIN0Q93C77U4DE8R8S6G"
      ▼ user: {anonymous_id: "01KGMXSTY02T20KF0XJH71YYPB_.tt.0",…}
          anonymous_id: "01KGMXSTY02T20KF0XJH71YYPB_.tt.0"
          email: "d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6"
          external_id: "3ad56881-ae45-4317-8a4d-f12eb5867a28"
          userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/144.0.0.0 Safari/537.36"
          variation_id: "default"
      event: "Pageview"
      event_id: "sh-29e36414-A27E-4604-ADF2-92482D7E40BB"
      is_onsite: false
      message_id: "messageId-1770229299137-9754552515065-CIN0Q93C77U4DE8R8S6G"
      partner: "Shopify"
```

*Figure 18 – Information collected via the TikTok Pixel when a visitor visits the sample webpage from Figure 17*

79.    To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

80.    The TikTok Terms describe how the TikTok Pixel operates and what information it shares with TikTok. The Terms state that use of the pixel allows TikTok to access website visitors' contact details, developer data, and event data.[35]

81.    The Terms further state that TikTok processes visitor data by matching contact details with corresponding TikTok accounts and associating those accounts with the visitors' event data.[36]

82.    The TikTok Terms require pixel users, including Defendant, to share or enable access to Business Products Data only in a transparent and lawful manner and to provide required notices and obtain the necessary rights, permissions, and lawful bases, including consent, before sharing information with TikTok.

---

[35] *TikTok Business Products (Data) Terms*, TIKTOK (last visited Feb. 27, 2026).

[36] *Id.*

CLASS ACTION COMPLAINT- 29

83.     The Terms also state that pixel users must not share data from or about children or data that includes health information, financial information, or other categories of sensitive information."[37]

84.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its visitors' data and warn its visitors that the Website would disclose their information in a manner that threatened their private information.

85.     Defendant used the TikTok Pixel under these Terms and therefore had notice of the obligations described in them.

**B.     The Facebook Pixel**

86.     Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring visitor interactions on their websites, which can then be shared with Facebook.

87.     The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Pixel.[38]

88.     Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[39] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[40]

---

[37] *Id.*

[38] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 27, 2026).

[39] *Id.*

[40] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

CLASS ACTION COMPLAINT- 30

89. This Pixel ID must match "a known Pixel ID" in Meta's system,[41] and is transmitted by the Meta Pixel.[42]

90. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[43]

91. Pixel is employed by Defendant to gather, collect, and then share visitor information with Facebook.[44] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website visitors to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting visitors into paying customers.[45]

92. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[46]

93. Once implemented on a website, the Facebook Pixel begins to share visitors' information the moment a visitor lands on the website.

94. When a Facebook visitor logs onto Facebook, tracking cookies, including the c_visitor cookie, the data cookie, and the fr cookie, are automatically created and stored on the visitor's device.[47] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook visitors.

---

[41] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan. 7, 2026)

[42] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 7, 2026).

[43] *Get Started*, FACEBOOK, (last visited Jan. 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

[44] The Facebook Pixel allows websites to track visitor activity by monitoring visitor actions ("events") that websites want tracked and share a tracked visitor's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 7, 2026).

[45] *See Meta Pixel*, FACEBOOK, (last visited Jan. 7, 2026).

[46] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 7, 2026).

[47] *Cookies Policy: What are cookies, and what does this* policy cover?, *Facebook* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 31

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

95.     The c_visitor cookie, for example, contains a series of numbers (the visitor's Facebook ID, or "FID") to identify a visitor's profile.



c_user=100091959850832;

*Figure 19– Sample c_visitor cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

96.     The FID can simply be appended to www.facebookcom/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 19*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

*Figure 20 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

CLASS ACTION COMPLAINT- 32

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

97.     The Pixel tracks visitor activity on web pages by monitoring events,[48] which, when triggered, cause the Pixel to automatically send data – here, visitors' Sensitive Information – directly to Facebook.[49] Examples of events utilized by websites include: (i) a visitor loading a page with a Pixel installed (the "PageView event");[50] (ii) when a visitor views pre-designated content, like products for sale (the "ViewContent" event)[51]. The Website utilizes these two pixel events.[52]

98.     Defendant's use of the Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel IDs of "1665277417065941", "8629396804531438", and "3975220449387180".

99.     Defendant uses the Facebook Pixel to monetize its Website visitors' Sensitive Information.

100.     Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of visitors' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

101.     Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a visitor's journey to purchasing the sample product on the Website from *Figure 17*.

---

[48] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 7, 2026).

[49] *See generally id.*

[50] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 7, 2026).

[51] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Jan. 7, 2026).

[52] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 33



*Figure 21 – Facebook Pixel tracking a visitor landing on the webpage from Figure 17 through the "ViewContent" event*

*Figure 22– Facebook Pixel tracking a visitor landing on the webpage from Figure 17 through the "PageView" event*

102.    When a business applies with Facebook to use the Facebook Pixel, it is provided details about its functionality, including with respect to private information.[53]

---

[53] *See Get Started*, META, (last visited Jan. 7, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

CLASS ACTION COMPLAINT- 34

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

103.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

104.    The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[54]

105.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[55]

106.    Facebook directs parties implementing the Facebook Pixel -here, Defendant - to encrypt request information[56] *before* data can be shared.[57]

107.    Facebook further provides Facebook Pixel visitors, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

108.    Facebook educates or reminds Facebook Pixel visitors of their responsibility to inform their visitors of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any Tracking Entities.[58]

109.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel and ignored Facebook's warnings to safely handle its

---

[54] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 7, 2026).

[55] *Id.*

[56] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes visitors' information visible. *See id.*

[57] *Id.*

[58] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 35

visitors' data and to warn its visitors that the Website would disclose information in a manner that threatened visitors' private information.

**C.    Google Tracking Tools**

110.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

*1.    Google Ads*

111.    Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web visitors.[59]

112.    The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the visitor's search results;[60] (iii) Google then allows advertisers to bid on those various keywords;[61] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

113.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[62] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

---

[59] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan. 6, 2026).

[60] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan. 7, 2026).

[61] *Id.*

[62] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan. 6, 2026).

CLASS ACTION COMPLAINT- 36

114.    AdSense for content or AdSense for search are methods by which AdSense functions.[63] In either configuration, AdSense matches advertisements to website visitors based on the content of the website and visitor activity.

115.    Google Ads intercepted Plaintiffs' viewing activity, as depicted below, using the sample webpage for "e-cam-pan-v48" on the Website.



*Figure 23 – Test search made on the Website resulted in sharing Content Views with Google Page Ads*

116.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

117.    Through Google AdSense, Google aggregates viewing data collected from website visitors. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in visitor behavior, Google gains insight into what

---

[63] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 37

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

visitors view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

118. Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[64] Google uses data on how visitors interact with websites to train its algorithms to provide more accurate and relevant search results.[65] For example, when a visitor clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that visitor's interests. By aggregating such data across visitors, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[66]

119. Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a visitor clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate visitor viewing data allows Google to further tailor its products to advertisers and visitors by training its algorithms on large volumes of data.

### 2. Google Analytics

120. Like the Facebook Pixel, Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[67]

---

[64] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan. 7, 2026).

[65] *Id.*

[66] *Id.*

[67] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 38

121.　GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[68] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[69]

122.　GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

123.　Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:



*Figure 24 – Test search made on the Website resulted in sharing search terms with Google Analytics*

---

[68] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 7, 2026).

[69] *Id.*

CLASS ACTION COMPLAINT- 39

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

124.     After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

**D.     The Twitter Pixel**

125.     X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track visitors' site actions or conversions (the "Twitter Pixel").

126.     To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a visitor makes a purchase.[70]

127.     With each event, website owners like Defendant can select the visitor action they want to track and the parameters to share about the action.

128.     Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[71]

129.     Parameters can include the contents of the action, the search terms used on the website, the email address of the visitor taking the action, the value of the product purchased, and the currency in which the purchase was made.[72]

130.     As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of visitors, to match them to Twitter visitors for the purpose of developing custom audiences to market and advertise to.[73]

[70] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Mar. 6, 2026).

[71] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Mar. 6, 2026).

[72] *Id.*

[73] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Mar. 6, 2026).

CLASS ACTION COMPLAINT- 40

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

131.     Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze visitor activity for visitors who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter visitors, the audience will be ready to use for targeting in ad campaigns.[74]

132.     The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.[75]

133.     An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of visitor behavior when a visitor visits the sample webpage in *Figure 17*:



*Figure 25 - Twitter Pixel active on the Website*

134.     To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

135.     The Twitter Terms are transparent that Twitter will process visitors' data to match contact details against corresponding accounts, and subsequently match those accounts with the visitors' corresponding event data.[76]

---

[74] *Id.*

[75] *Id.*

[76] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-

CLASS ACTION COMPLAINT- 41

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

136.    Twitter obligates Twitter Pixel visitors, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with Tracking Entities to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."[77]

137.    Twitter makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

138.    TikTok educates or reminds TikTok Pixel visitors of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[78]

139.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel, and ignored Twitter's warnings to safely handle its visitors' data and warn its visitors that the Website would disclose their information in a manner that threatened their Sensitive Information.

**E.    The Snap Pixel**

140.    Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

141.    To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, receive a Pixel ID, select the information to be collected,

---

audiences#:~:text=*%20Advertisers%20may%20not%20create%20advertisements%20which,is%20otherwise%20prohibited%20by%20our%20Ads%20Policies. (last visited Mar. 6, 2026).

[77] *Id.*

[78] *Id.*

CLASS ACTION COMPLAINT- 42

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

follow specific guides for integration with third-party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[79]

142.    The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track visitors' actions and behavior on websites to measure ad performance, optimize ad campaigns, and build targeted audiences for better advertising results.[80]

143.    "For the Pixel to work, [Snapchat] must receive a Pixel ID and a standard event type[,]" at a minimum.[81]

144.    The Pixel ID is an "[a]dvertiser specific ID . . ."[82] where the Pixel ID is used to initialize the Snap Pixel's tracking,[83] identifying which advertising account receives the collected data.

145.    This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[84]

146.    Key features of the Snap Pixel include tracking visitor actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[85]

---

[79] *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Dec. 22, 2025).

[80] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited Oct. 09, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[81] Snap Pixel FAQ, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Dec. 22, 2025).

[82] *Snap Pixel Helper Glossary*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Dec. 22, 2025)

[83] *See About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Dec. 22, 2025)

[84] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025).

[85] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Dec. 22, 2025).

CLASS ACTION COMPLAINT- 43

Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type information.[86] The information is collected immediately as visitors land on the website where the pixel is installed. [87]

147.    The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[88]

148.    The Snap Pixel collects:

- The time the website actions occurred;[89]

- Device information such as the hardware model, operating system, and browser type used;[90]

- Cookies;[91]

- Metadata such as button clicks, time spent on the site, conversations, and page visits;[92] and

- IP addresses for general geographic data.[93]

---

[86] *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Mar. 6, 2026).

[87] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Mar. 6, 2026); *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Mar. 6, 2026).

[88] *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings (last visited Mar. 6, 2026).

[89] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Mar. 6, 2026).

[90] *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Mar. 6, 2026).

[91] *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information (last visited Mar. 6, 2026).

[92] Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/ (last visited Mar. 6, 2026).

[93] *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Mar. 6, 2026); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025); *Data Processing* Agreement, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement (last visited Mar. 6, 2026).

CLASS ACTION COMPLAINT- 44

149.    The Snap Pixel enables website owners, such as Defendant, to understand how visitors navigate to their site. This data helps Defendant refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[94]

150.    The Website's Snap initialization code and Pixel event activations transmit Defendant's Pixel ID in the form of a URL parameter named "pid", which contains Defendant's Snap Pixel ID value of "3682256c-7c66-4de1-ac49-d05c6f91bfb2". This data is sent both when receiving communications from the Website and when visitors send communications to the Website.

151.    The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

152.    Snap also benefits independently from non-customer-list audience information.[95]

153.    The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[96] Defendant can retarget visitors who viewed specific pages or made purchases and build lookalike audiences to reach new visitors with similar characteristics.[97]

154.    The Snap Pixel collects data about visitors to the Website and matches that data with information Snapchat previously collected about users. Defendant and Snapchat use the combined data to improve Defendant's conversion rates and reduce advertising costs.

155.    Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or use tools like Google Tag Manager for a seamless setup.[98] Advertisers,

---

[94] Aldeghi, *supra* note 2.

[95] *See Privacy Policy*, *Section 2(g),* SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Mar. 6, 2026).

[96] Aldeghi, *supra* note 2.

[97] *Id.*

[98] *Id.*

CLASS ACTION COMPLAINT- 45

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking, and track visitor activity.[99]

156.    Defendant, through the Snap Pixel, uses data and cookies to track visitors and serve them relevant ads on Snapchat based on their interactions with the Website.[100] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[101]

157.    Defendant uses the Snap Pixel to collect information about visitors who purchase products on the Website. Defendant uses this information to support its advertising and marketing activities:

- **Measure conversion events that matter**: See all the actions visitors take on the Website, across all devices, and attribute conversions back to ad campaigns.

- **Reach the perfect audience**: Defendant can create custom audiences and lookalike audiences based on the specific actions visitors have taken on the Website.

- **Optimize advertising campaigns**: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[102]

158.    An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:

---

[99] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Mar. 6, 2026).

[100] *Id.*

[101] *Id.*

[102] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Mar. 6, 2026).

CLASS ACTION COMPLAINT- 46



*Figure 26 - Snap Pixel active on the Website*

159.   When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers, as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as visitors take certain actions on the Website, like viewing a page.

160.   The Snap Pixel's functionality is not disclosed on the Website.

161.   By using the Snap Pixel and providing Snapchat with visitors' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

162.   By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any Sensitive Information or special category data.[103]

163.   The Snap Terms further requires Snap Pixel visitors, such as Defendant, of their responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[104]

---

[103] *Personal Data Terms*, SNAP (Dec. 9, 2024), https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary (last visited Mar. 6, 2026).

[104] *Id.*

CLASS ACTION COMPLAINT- 47

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

164. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its visitors' data and to warn its visitors that the Website would disclose their information in a manner that threatens their private information.

**F. Bazaarvoice Pixel**

165. Defendant installed a pixel created by the ratings and review platform Bazaarvoice on the Website.

166. Bazaarvoice provides software that allows website operators to implement review platforms and manage product reviews on their websites.[105]

167. Bazaarvoice also offers an analytics integration known as the BV Pixel. The BV Pixel allows website operators to collect and monitor visitor behavior on their websites.[106]

168. The BV Pixel captures visitor events such as product purchases, interactions with Bazaarvoice reviews, and visits to webpages that contain Bazaarvoice content, including product pages displaying reviews.[107]

169. The BV Pixel can also transmit personally identifiable information when configured to do so. When a visitor triggers certain events, such as submitting a review, the BV Pixel transmits information, including the visitor's email address, locale, nickname, and visitor ID.[108]

---

[105] https://www.bazaarvoice.com/ (last visited Feb. 12, 2026).

[106] https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bv_pixel_analytics (last visited Feb. 12, 2026).

[107] https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bvpixel/a/steps-to-implement-bv-pixel (last visited on Feb. 12, 2026).

[108] *Id*

CLASS ACTION COMPLAINT- 48

170. Bazaarvoice also uses cookies to track visitors when they access a website. These cookies are first-party cookies placed through the website and allow Bazaarvoice to identify and track visitors.[109]

171. Two cookies used by Bazaarvoice to track visitors are the BVBRANDID cookie, which persists for one year, and the BVBRANDSID cookie, which persists for the duration of the visitor's browsing session.[110]

172. Bazaarvoice informs website operators that "these cookies can only be set if the site visitor has given consent through a cookie consent panel on your website."[111]

173. Defendant's use of the BV Pixel on the Website appears in the figures below.



*Figure 27– The BV Pixel on the Website*

---

[109] *Bazaar Cookies* (Updated on 2/24/2026) https://docs.bazaarvoice.com/articles/#!portal-basics/cookies/q/session/qp/1/qid/239076 (last visited on Feb. 27, 2026).

[110] *Id.*

[111] *Id.*

CLASS ACTION COMPLAINT- 49

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Headers   Payload   Preview   Response   Initiator   Timing   Cookies

▼ Query String Parameters          View source          View URL-encoded

cl                         PageView
loadId                     4349816550d0347ba0
type                       Product
BVBRANDID                  f18babce-31ce-4fe3-a458-44e91d2d2870
BVBRANDSID                 3c428fd3-e73c-4807-beed-521a0a71dc89
tz                         300
sourceVersion              3.18.2
magpieJsVersion            3.18.2
source                     bv-loader
environment                prod
client                     WyzeLabs
dc                         17570
host                       www.wyze.com
locale                     en_US
deploymentZone             main_site
displaySegment             baseline
productId                  8742988480674
bvProductVersion           6.48.4
version                    6.48.4
bvProduct                  SwatReviews
subjectType                Product
subjectId                  8742988480674
contentType                Review
pages                      1
numReviews                 0
numRatingsOnlyReviews      0
percentRecommend           0.00
avgRating
siteId                     main_site
label                      Default

CLASS ACTION COMPLAINT- 50

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 28 – The Payload for the BV Pixel on the Website*

174.    These figures show that Defendant placed the BV Pixel on the Website. The BV Pixel intercepted and transmitted the contents of visitors' communications with the Website, along with identifying cookies, to Bazaarvoice.

175.    Defendant also placed Bazaarvoice identifying cookies on the Website, as shown in the figure below.

CLASS ACTION COMPLAINT- 51

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

| Name | Value | Domain | Path | Ex... | Size | Htt... | Se... | Sa... | Pa... | Cr... | Pri... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __cf_bm | DMrN3uNK9y3Fry... | .wyze.com | / | 20... | 206 | ✓ | ✓ | | | | Me... |
| __Secure-YEC | | .youtube.com | / | 20... | 12 | ✓ | ✓ | ⓘ... | | | Me... |
| _FPAC | _pk_id.ba7f=329F... | .wyze.com | / | 20... | 69 | | | Lax | | | Me... |
| _FPAC_S | _pk_ses.ba7f=* | .wyze.com | / | 20... | 21 | | | Lax | | | Me... |
| _FPCI | %7B%22IsMobile... | .wyze.com | / | 20... | 197 | | | Lax | | | Me... |
| _ga | GA1.1.147102116... | .bazaarvoice... | / | 20... | 30 | | | | | | Me... |
| _ga_FSK461HZ4T | GS2.1.s177091458... | .bazaarvoice... | / | 20... | 59 | | | | | | Me... |
| _ga_HCS3ZYFNCB | GS2.1.s177163959... | .bazaarvoice... | / | 20... | 59 | | | | | | Me... |
| _gcl_au | 1.1.122476841.17... | .bazaarvoice... | / | 20... | 31 | | | | | | Me... |
| _hjSessionUser_27... | eyJpZCI6IjQ2YTF... | .bazaarvoice... | / | 20... | 138 | | ✓ | No... | | | Me... |
| _mkto_trk | id:848-PGD-174&... | .bazaarvoice... | / | 20... | 83 | | | | | | Me... |
| _nb_sp_id.bd2d | cc9439f0-8d32-42... | www.wyze.c... | / | 20... | 122 | | ✓ | No... | | | Me... |
| _nb_sp_ses.bd2d | * | www.wyze.c... | / | 20... | 16 | | ✓ | No... | | | Me... |
| _shop_app_essential | :AZuzbmtXAAEB3... | .shop.app | / | 20... | 383 | ✓ | ✓ | No... | | | High |
| _shopify_essential | :AZx23dIMAAEAjx... | www.wyze.c... | / | 20... | 688 | ✓ | ✓ | Lax | | | High |
| _shopify_essential | :AZxtLDAzAAEAW... | shop.app | / | 20... | 11... | ✓ | ✓ | Lax | | | High |
| AMCV_774203725... | 1585540135%7C... | .amazon.com | / | 20... | 280 | | | | | | Me... |
| AMCVS_77420372... | 1 | .amazon.com | / | Se... | 42 | | | | | | Me... |
| at-main | Atza|gQB1S0nxAw... | .amazon.com | / | 20... | 362 | ✓ | ✓ | | | | Me... |
| av-profile | cGlkPWFtem4xLm... | .amazon.com | / | 20... | 201 | ✓ | ✓ | | | | Me... |
| av-timezone | America/New_York | .amazon.com | / | 20... | 27 | | | | | | Me... |
| BVBRANDID | f18babce-31ce-4f... | .wyze.com | / | 20... | 45 | | ✓ | Lax | | | Me... |
| BVBRANDSID | 3c428fd3-e73c-48... | .wyze.com | / | 20... | 46 | | ✓ | Lax | | | Me... |
| cart | hWN8yIkA7kqCp... | shop.app | / | 20... | 69 | | | Lax | | | Me... |
| cart | hWN8yIkA7kqCp... | www.wyze.c... | / | 20... | 69 | | | Lax | | | Me... |
| cart_currency | USD | shop.app | / | 20... | 16 | | | Lax | | | Me... |
| cart_currency | USD | www.wyze.c... | / | 20... | 16 | | | | | | Me... |
| cf_clearance | XvmqxjvKmsLOXl... | .wyze.com | / | 20... | 310 | ✓ | ✓ | No... | htt... | | Me... |
| CLID | d79f2461f50b455... | www.clarity.... | / | 20... | 54 | ✓ | ✓ | No... | | | Me... |
| clientside-cookie | 6c29d5efefe6c366... | www.wyze.c... | / | 20... | 327 | | ✓ | No... | | | Me... |
| crl8.fpcuid | 6c751d4c-5866-4... | .bazaarvoice... | / | 20... | 47 | | | | | | Me... |
| FIGPII_TF-357543 | 61596 | .wyze.com | / | 20... | 21 | | | Lax | | | Me... |

*Figure 29– First-party cookies placed by Defendant on the Website, including the BV Pixel cookies*

176.   The figure shows wyze.com placing the BVBRANDID and BVBRANDSID first-party cookies, allowing the BV Pixel to track individual users on the Website.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

CLASS ACTION COMPLAINT- 52

**V.     The Tracking Tools are Pen Registers or Trap and Trace Devices.**

177.     California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(b).

178.     California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but such information does not include the contents of any communication." Cal. Penal Code § 638.50(c).

179.     The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by visitors, who are never informed that the Website is collaborating with the Tracking Entities to obtain their IP address and other identifying information. As such, it is a "trap and trace" device. *See Rodriguez v. Autotrader.com, Inc.*, No. 2:24-cv-08735-RGK-JC, 2025 WL 65409, at *5 (C.D. Cal. Jan. 8, 2025) (Klausner, J.).

180.     The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, it is designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' device to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' device.

181.     Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

182.     CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2; *see Greenley v.*

CLASS ACTION COMPLAINT- 53

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

183.    Defendant did not obtain Plaintiffs' or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did the Defendant obtain a court order.

## VI.    Defendant Violated CIPA § 631 by Intercepting the Contents of Plaintiffs' Communications

184.    CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024). Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts. *Id.*

185.    Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

### A.    Defendant Procured Tracking Entities to Intercept the Contents of Communications in Transit

186.    Under federal and California wiretap law, the "contents" of a communication refer to the intended message conveyed by the communication, not merely record or routing information generated incidentally. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

187.    Transmitted URLs that include both the path and query string reflect the substance of a visitor's communication and therefore constitute content. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

CLASS ACTION COMPLAINT- 54

188.    Here, the network requests intercepted by the Tracking Entities included Request URLs containing the names of the webpages that visitors viewed on the Website.

189.    The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browsers and continued to transmit data at the moment Plaintiffs submitted information through the Website.

190.    This interception, duplication, and transmission occurred inside Plaintiffs' browser, before the communications reached their intended destination, and therefore occurred while the communications were in transit. *See Esparza v. UAG Escondido A1 Inc.*, No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

191.    The Tracking Entities were third parties to Plaintiffs' communications with the Defendant and used the contents of Plaintiffs' and Class Members' communications to build marketing profiles of them in real time.

192.    Defendant's deployment of the Tracking Tools enabled those Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA § 631.

**B.    Defendant Aided and Abetted Third-Party Interceptions**

193.    A party violates CIPA § 631 not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

194.    Defendant knowingly embedded and configured the Tracking Tools in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

CLASS ACTION COMPLAINT- 55

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

195.    Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications.

196.    Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

**C.    Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls**

197.    The Website's default settings permitted tracking to begin immediately, before visitors had any opportunity to review or act upon the cookie banner.

198.    As a result, visitors were tracked as soon as they landed on the Website's home page, without prior consent.

199.    Plaintiffs visited the Website while those default tracking settings were active.

200.    Visitors to the Website are shown a cookie banner offering the option to decline cookies.



*Figure 30 – The Cookie Banner shown to visitors who visit the Website*

201.    Despite those representations, even visitors who declined all unnecessary cookies continued to be tracked by Bazaarvoice cookies.

202.    Representations regarding cookie-consent controls are materially misleading where tracking continues despite visitors' opt-out selections.

203.    Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to

CLASS ACTION COMPLAINT- 56

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[112]

204.    The  Tracking  Entities  independently  benefit  from  intercepting communications. They use data collected through the Tracking Tools to improve their advertising products and to market those capabilities to other businesses.[113]

## CLASS ALLEGATIONS

205.    Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure  23(a),  23(b)(2),  or  23(b)(3)  on  behalf  of  the  following  Class  (collectively "the Class"):

> All visitors who visited and interacted with the Defendant's website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

Plaintiff Skjerven brings this class action individually and on behalf of the following California Subclass:

> All visitors who visited and interacted with the Defendant's website while located in the State of California during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "California Subclass").

206.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns,

---

[112] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Jan. 7, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 7, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Jan. 7, 2026).

[113] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Jan. 7, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 7, 2026).

CLASS ACTION COMPLAINT- 57

or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

207. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

208. NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be in the thousands, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by the Defendant.

209. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

      a.    Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

      b.    Whether Defendant obtained effective and informed consent to do so;

      c.    Whether Class Members are entitled to statutory penalties; and

      d.    Whether Class Members are entitled to injunctive relief.

210. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by the Defendant, Plaintiffs are asserting claims that are typical of the Class.

211. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation.

CLASS ACTION COMPLAINT- 58

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

212.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, the Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of The Federal Wiretap Act 18 U.S.C. § 2510, et seq.**
**(On behalf of Plaintiffs and the Class)**

213.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

214.    Plaintiffs bring this cause of action individually and on behalf of all Class Members.

215.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

216.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

217.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

218.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

CLASS ACTION COMPLAINT- 59

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

219.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

220.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

221.    Defendant is a "person" within the meaning of the Wiretap Act.

222.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

223.    Plaintiffs had a reasonable expectation of privacy in their electronic communications with the Defendant's Website, including their searches, browsing activity, and order-related interactions, particularly where the Defendant represented through its cookie banner, cookie-preference interface, and Privacy Policy that visitors could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

224.    The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting visitors' choices, intent, and behavior on a commercial website, such as searches, menu selections, and order interactions, are sensitive and convey the substance and meaning of the communication.

225.    A reasonable visitor is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require visitors to assume that their privacy will be illegally violated as a matter of course.

226.    Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website.

227.    Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking

CLASS ACTION COMPLAINT- 60

Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

228.    Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through their browser.

229.    At all relevant times, the Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of visitors' communications to Tracking Entities.

230.    Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential tracking through Defendant's cookie-preference interface.

231.    The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

232.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

> a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

> b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

CLASS ACTION COMPLAINT- 61

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

c.     reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 631
### (On behalf of Plaintiff Skjerven and the California Subclass)

233.     Plaintiff Skjerven incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

234.     Plaintiff Skjerven brings this cause of action on behalf of himself and all California Subclass Members.

235.     CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

236.     CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

CLASS ACTION COMPLAINT- 62

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

237.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

238.    In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

239.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

240.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of the Defendant. Within the relevant time period, the Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

241.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

242.    Plaintiff Skjerven and California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

CLASS ACTION COMPLAINT- 63

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

**THIRD CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.51**
**(On behalf of Plaintiff Skjerven and the California Subclass)**

243.    Plaintiff Skjerven incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

244.    Plaintiff Skjerven brings this cause of action on behalf of himself and all California Subclass Members.

245.    California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

246.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

247.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

248.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

249.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a).

250.    No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by the Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are

CLASS ACTION COMPLAINT- 64

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

designed to capture the IP addresses, email, routing, addressing, and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

251.    The Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Skjerven's and California Subclass Members' activity on the Website.

252.    The Defendant did not obtain consent from Plaintiff Skjerven and California Subclass Members before using pen register or trap and trace technology to identify visitors of its Website, and has violated Section 638.51.

253.    As a direct and proximate result of Defendant's conduct, Plaintiff Skjerven and California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

**FOURTH CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Class)**

254.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

255.    Plaintiffs bring this cause of action individually and on behalf all Class Members.

256.    The tort of intrusion upon seclusion requires (a) an intentional intrusion into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy, and (b) that the intrusion be highly offensive to a reasonable person.

257.    By causing the Tracking Tools to be placed on visitors' browsers and devices and by transmitting visitors' Sensitive Information to Tracking Entities despite visitors' opt-outs, Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class Members.

CLASS ACTION COMPLAINT- 65

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

258. Plaintiffs and Class Members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that visitors could opt out of the sale/sharing of their personal information and opt out of non-essential cookies and Tracking Tools, and because California law protects such communications.

259. Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to visitors' Sensitive Information despite visitors' express rejection of such tracking, was highly offensive to a reasonable person.

260. As a direct and proximate result of Defendant's intentional intrusion, Plaintiffs and Class Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

### FIFTH CAUSE OF ACTION
### Common Law Fraud, Deceit, and/or Misrepresentation
### (On behalf of Plaintiffs and the Class)

261. Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

262. Plaintiffs bring this cause of action individually and on behalf of all Class Members.

263. Defendant made affirmative representations to visitors through its cookie banner, cookie preferences interface, and related disclosures that visitors could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

264. Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and analytics cookies, and would stop the transmission of visitors' browsing activity, interactions, and related data to the Tracking Entities.

CLASS ACTION COMPLAINT- 66

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

265. Defendant made these representations at the time visitors first accessed the Website and again when visitors were prompted to review and confirm their cookie preferences.

266. These representations were false and misleading. After visitors, including Plaintiffs, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit visitor data to Tracking Entities.

267. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to visitors' expressed privacy choices.

268. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when visitors declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on visitor preferences, and Defendant could have implemented such measures.

269. Defendant made misrepresentations with the intent to induce reliance by visitors, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for their own commercial benefit.

270. Plaintiffs and Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

271. Plaintiffs' reliance was reasonable because Defendant presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

CLASS ACTION COMPLAINT- 67

272. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

273. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize visitors' data despite representing that such practices would cease upon opt-out.

274. Plaintiffs and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

### SIXTH CAUSE OF ACTION
**Violation of the California Consumer Legal Remedies Act
Cal. Civ. Code §§ 1770, et seq. ("CLRA")
(On behalf of Plaintiff Skjerven and the California Subclass)**

275. Plaintiff Skjerven incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

276. Plaintiff Skjerven brings this cause of action on behalf of himself and all California Subclass Members.

277. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

278. Defendant is a person under the CLRA.

279. Plaintiff Skjerven is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Website to view, research, and potentially purchase camera products.

280. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Website. Defendant violated

CLASS ACTION COMPLAINT- 68

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

281. By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

282. By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

283. Defendant's failure to disclose was material to Website visitors such as Plaintiff. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

284. Defendant undertook deceptive acts or practices, in violation of the CLRA, by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

285. By this fraud, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

286. By this fraud, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

287. Plaintiff Skjerven and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

CLASS ACTION COMPLAINT- 69

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**SEVENTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")**
**(On behalf of Plaintiff Skjerven and the California Subclass)**

288.   Plaintiff Skjerven incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

289.   Plaintiff Skjerven brings this cause of action on behalf of himself and all California Subclass Members.

290.   The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

291.   By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant has violated the unlawful prong of the UCL.

292.   By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

293.   By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

294.   By actively and fraudulently deceiving visitors about its ability to disable the tracking pixels, Defendant has violated the unlawful prong of the UCL.

295.   Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' personal identifying information without knowledge or consent. Defendant disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping visitors' communications with the Website. Defendant fraudulently deceived visitors about its ability to

CLASS ACTION COMPLAINT- 70

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

296.    Plaintiff Skjerven has standing to bring claims against Defendant under the UCL. Plaintiff Skjerven's information was tracked and recorded without consent. Plaintiff Skjerven's data was used to build personal profiles for advertising purposes without consent.

297.    Plaintiff Skjerven would have considered it important to the decision to visit Defendant's Website to know that his data was being tracked and recorded without his consent.

298.    Because of Defendant's UCL violations described above, Plaintiff Skjerven suffered injury by losing control of his personal data and having his personal information tracked and recorded without his consent.

299.    Plaintiff Skjerven and California Subclass Members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

## **PRAYER**

WHEREFORE, Plaintiffs pray for the following relief against Defendant:

    a.    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

    b.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

    c.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

    d.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website visitors;

    e.    An award of statutory damages or penalties to the extent available;

CLASS ACTION COMPLAINT- 71

f.    For damages in amounts to be determined by the Court and/or jury;

g.    For pre-judgment interest on all amounts awarded;

h.    For an order of restitution and all other forms of monetary relief;

i.    Reasonable attorneys' fees and costs; and

j.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

### **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED this 16th day of April, 2026.

TOUSLEY BRAIN STEPHENS PLLC


By: *Kim D. Stephens, P.S.*
By: *Rebecca L. Solomon*
Kim D. Stephens, P.S., WSBA #11984
kstephens@tousley.com
Rebecca L. Solomon, WSBA #51520
rsolomon@tousley.com
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Telephone: 206.682.5600/Fax: 206.682.2992

Mark S. Reich*
mreich@zlk.com
LEVI & KORSINSKY, LLP
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: 212.363.7500/Fax: 212.363.7171

*pro hac vice* forthcoming

***Attorneys for Plaintiffs and Putative Class***

CLASS ACTION COMPLAINT- 72